UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Norfolk Division


MICHAEL ANTHONY JORDAN,

    Plaintiff,

v.                                            2:13cv335

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

    Defendant.


### MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff Michael Jordan ("Jordan") seeks judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying his claim for a period of disability insurance benefits ("DIB") and supplemental security income ("SSI") under Title II and Title XVI of the Social Security Act. Specifically, Jordan claims the ALJ failed to properly consider the evidence submitted by Jordan's treating cardiologist, Dr. Chough, and improperly concluded that he had the RFC to perform a limited range of sedentary work. This action was referred to the undersigned United States Magistrate Judge pursuant to the provisions of 28 U.S.C. §§ 636(b)(1)(B) and (C), and Rule 72(b) of the Federal Rules of Civil Procedure. For the reasons stated below, this report recommends that the final decision of the Commissioner be affirmed.

## I.  PROCEDURAL BACKGROUND

Jordan filed applications for SSI and DIB, alleging disability beginning May 20, 2009. (R. 148-61). The Commissioner denied his application initially (R. 98-103), and upon reconsideration. (R. 108, 115). Jordan then requested an administrative hearing, which was conducted on May 10, 2012. (R. 17-26).

An Administrative Law Judge ("ALJ") concluded that Jordan was not disabled within the meaning of the Social Security Act, and denied his claim for benefits. (R. 17-26). The Appeals Council denied review of the ALJ's decision (R. 1-6), thereby making the ALJ's decision the final decision of the Commissioner. Jordan then filed this action seeking judicial review of the Commissioner's final decision under 42 U.S.C. § 405(g). This case is now before the Court to resolve the parties' cross-motions for summary judgment.

## II.  FACTUAL BACKGROUND[1]

Born November 23, 1964, Jordan is a 5'9" 220-pound male with a high school education. (R. 19, 24). Prior to his alleged onset of disability, Jordan worked many different jobs, all of which involved heavy labor. (S. R. 9-11). A self-described "Jack of all Trades," he last worked in 2009

---

[1] For purposes of this report, citations to the medical record will be documented as (R. ___), and citations to the ALJ's Hearing Transcript, which was filed as a Supplemental Record, will be documented as (S. R. ___).

installing railroad track and ties and operating heavy equipment for the City of Norfolk.[2]  (S. R. 7-9; R. 171).

While Jordan's medical records reveal a history of cardiovascular disease, they also "show a chronic history of neglect regarding compliance with treatment and medication." (R. 22).  In March 2010, Jordan was admitted to Beth Israel Medical Center in New York City for "atypical community acquired pneumonia."  (R. 244-328).  Jordan's social history disclosed that during the previous 20 years, he drank beer and smoked half a pack of cigarettes daily, and abused cocaine twice weekly. (R. 279).  After consulting with Dr. Meir Shinnar, the hospital's Director of Heart Failure, Jordan was diagnosed with dyspnea, acute systolic heart failure, and left ventricle thrombus.  (R. 281).  Dr. Shinnar suggested he take 10mg of Lisinopril once a day, with an eventual target of 40mg daily. Dr. Shinnar pointedly counseled against use of any beta blockers at that time as Jordan was a "chronic cocaine user."  (R. 281). After spending approximately five days at the hospital for treatment, Jordan left against medical advice on March 27, 2010. (R. 274).

On March 28, 2010, Jordan presented to Sentara Norfolk

---

[2] It should be noted that the Record is relatively unclear on this point. Jordan's work history report indicates no earnings after 2009, and in response to questions by the ALJ, Jordan seemed to reference a corresponding hospital visit in New York that preceded his unemployment. But the New York hospital stay is documented in his records as having occurred in 2010, not 2009.

General Hospital, stating he could not afford the medications he was prescribed in New York, namely Avelox and Coumadin. (R. 274, 332). He had improved respiratory complaints, and no chest pain, palpitations, shortness of breath, or other physical ailments. Id. On exam, he had no respiratory distress and displayed normal breathing. (R. 333). Jordan was diagnosed with "[p]neumonia vs non-compliance with anticoagulant vs PE vs electrolyte abn." Id. Hospital records indicate that medical staff planned to consult with Jordan to "help [him] with [the] cost of medication," but he left against medical advice prior to the planned consultation. Jordan was, however, reportedly advised at some point before he left that most of the needed medications were available from Wal-Mart's $4.00 list. (R. 334).

During a consultative exam performed in early July 2010, Dr. Christopher Newell, M.D documented Jordan's history of congestive heart failure, hypertension, and lower back problems, as well as a herniated disc in his neck.[3] (R. 357-58). During this visit, Jordan complained of daily chest pain, shortness of breath, and "substernal tightness and pressure that is associated with any type of exertion." He also denied any

---

[3] As Jordan's present appeal concerns itself solely with the ALJ's alleged failure to properly analyze the records of a treating cardiologist, the report will focus primarily on those records specifically involving Jordan's cardiovascular difficulties, not those bearing on his musculoskeletal condition.

tobacco or alcohol use. (R. 357-58).

On exam, Jordan was alert and oriented, but appeared irritated throughout. (R. 358-59). Dr. Newell diagnosed a cervical herniated disc, lumbar degenerative disc disease/lumbar spondylosis, congestive heart failure with a 3/6 systolic murmur and probable angina, hypertension, and "probable depression." (R. 360). He opined that Jordan could stand and walk at least two hours during an eight-hour workday, sit for approximately six hours, and could frequently and occasionally lift and carry ten pounds. Id. He had no visual or communicative limitations, could ambulate without assistance, handle, feel, grasp and finger occasionally and frequently, but should limit any overhead reaching, bending, stooping or squatting. Id.

Later that month, Jordan visited Dr. Thomas Klevan, M.D. for an evaluation of his cardiomyopathy and apical thrombus.[4] (R. 362-64). Dr. Klevan reviewed Jordan's medical history, noting that Jordan was seen at Park Place Medical Center in April 2010 following his initial New York hospitalization, where he was advised to continue his medications and to follow-up for further treatment. Jordan apparently did not return to the Clinic, however, failed to keep an initial appointment with Dr.

---

[4] Defined separately, "apical" refers to that which is "[s]ituated nearer to the apex of a structure in relation to a specific reference point." Maureen Barlow Pugh et al. eds. Stedman's Medical Dictionary 111 (27th ed. 2000). "Thrombus," in turn, is a "clot in the cardiovascular systems formed during life from constituents of blood; it may be occlusive or attached to the vessel or heart wall without obstructing the lumen." Id. at 1832.

Klevan in May, and had since run out of all medications. (R. 362). Following his examination, Dr. Klevan recommended Jordan continue taking Lasix, Zocor (though that was "somewhat optional"), and a "statin drug" that would be a "beta-blocker" like Coreg or Metoprolol - all of which were generic drugs that could be purchased at Walmart or Target for $4.00. (R. 363). Dr. Klevan also informed Jordan of the Congestive Heart Failure Clinic at Norfolk General as "a place that he could have his medications provided, and titrated as well," and opted not to set a follow-up appointment as "the Heart Failure Clinic and Park Place can meet his needs for care adequately." Id.

On November 9, 2010, Jordan presented to Maryview Medical Center's Emergency Department for shortness of breath. (R. 370). He indicated he had been taking Coumadin, but had run out three months prior and had not taken any since. (R. 371). Jordan reported progressively worsening shortness of breath and a "tingling" on the left side of his chest. On exam, he was well-developed, well-nourished, and in no acute distress. His heart had a regular rate and rhythm with "no murmurs, rubs, or gallops." (R. 372). Jordan was diagnosed with shortness of breath and congestive heart failure and was discharged in stable condition on the same day. (R. 385).

Jordan then visited Dr. Dae B. Chough on November 10, 2010 for a cardiovascular examination. (R. 402). Dr. Chough

6

observed that Jordan had experienced "frequent episodes of dyspnea in the past 7 or 8 months," beginning with his visit to Beth Israel Medical Center in New York. Dr. Chough noted Jordan's medical noncompliance, as well as "a longstanding history of hypertension which has not been properly treated because of his noncompliance." (R. 402). Jordan again denied any current use of tobacco or alcohol. Id.

On exam, he appeared well-developed, well-nourished, alert, and oriented. His heart rate was regular, as was his heart rhythm. However, Jordan did have a "grade II/VI systolic ejection murmur at the aortic area," as well as "a low grade early decrescendo diastolic murmur along the left sternal border." (R. 403). An electrocardiogram disclosed, among other things, a normal sinus rhythm, left axis deviation with a pattern of left ventricular hypertrophy, and atrial enlargement. Id.

Given his findings, Dr. Chough diagnosed Jordan with hypertensive cardiomyopathy, along with congestive heart failure, moderate aortic insufficiency, mild aortic stenosis, and medical noncompliance. Id. Dr. Chough prescribed Lasix, an ACE inhibitor, Aldactone, and Coreg, and mentioned the possibility of reinitiating Coumadin as circumstances dictated. Although, he noted "it would be difficult to treat him with Coumadin because of his history of medical noncompliance." Id.

Lastly, Dr. Chough opined that Jordan would be unable to continue his work in construction and advised that he apply for social security. Id.

About a year later, on November 5, 2011, Jordan returned to Maryview's Emergency Room, reporting difficulty breathing after drinking alcohol. (R. 473). Jordan had been noncompliant with his medication and also admitted to recent alcohol and cocaine use. (R. 474). He complained of increased dyspnea on exertion, as well as edema for three days. No significant changes were made in Jordan's medications, and he was discharged in stable condition later that day. (R. 486).

He returned on November 25, 2011, however, complaining of shortness of breath. (R. 447). Dr. Luiskutty, the attending physician, noted Jordan had been noncompliant with his medications, smoked four cigarettes and drank 40oz. of beer daily, and recently used marijuana and cocaine. (R. 448-49). A transthoracic echocardiogram disclosed features consistent with dilated cardiomyopathy, significant valve disease, and pulmonary hypertension. (R. 594). Dr. Luiskutty diagnosed Jordan with congestive heart failure, medical non-compliance, and polysubstance abuse, later discharging him in stable condition. (R. 459).

Jordan presented to Maryview again on December 15, 2011 for follow-up. He reported feeling better, though he was still

tired.  He denied having any chest pain, tightness, heaviness, palpitations, or shortness of breath, but admitted to dyspnea on exertion.  (R. 597).  Jordan also had not taken his Coreg medication as instructed following his last visit.  He was still not taking Coumadin and admitted to not wanting to take the medication at all.  After discussing its importance due to the likelihood of a thrombus in his left ventricle, Jordan stated that "if he decides to take it, he will not start it until after the beginning of the year."  (R. 599).  Jordan presented again to Maryview on December 21, 2011 for a post-hospital follow-up, with the results of that visit much the same – no new complaints and continued medical non-compliance.  (R. 600-02).

Following Jordan's initial visit with him, Dr. Chough completed a Physical Medical Source Statement in December 2010. In it, he specifically did not evaluate Jordan's ability to sit, stand, or walk during an ordinary workday.  (R. 398-401).  He did observe, however, that Jordan needed no assistive device to ambulate, but stated he could rarely lift and carry up to 10 pounds, and had no significant limitation in his ability to reach, handle, or finger objects.  (R. 400).  Dr. Chough also opined that Jordan should never twist, stoop, crouch, or climb stairs or ladders. Id.  He would also likely be "off task" 25% or more of a typical workday, and was "[i]ncapable of even 'low stress' work."  (R. 401).

Dr. Chough completed a second Physical Medical Source Statement more than a year later on March 1, 2012. (R. 435-43). This time, Dr. Chough did not evaluate Jordan's physical abilities to sit, stand, walk, lift, carry, perform postural functions, or perform reaching, handling or fingering. (R. 435-39). Rather, he referenced his attached treatment note from February 16, 2012, which primarily indicated that Jordan had experienced shortness of breath and fatigue. (R. 440).

During the February visit, Jordan complained of dyspnea on exertion and easy fatigue, but denied any chest pain, resting dyspnea, or orthopnea. Dr. Chough again noted Jordan's continued medical noncompliance, as well as his longstanding history of poorly treated hypertension due to that noncompliance. (R. 606). A physical exam revealed normal heart rate and rhythm, no gallop and no friction rub. (R. 607). Dr. Chough also noted that a "harsh early systolic murmur [was] present with a grade of 2/6 at the upper right sternal border radiating to the apex." Id. Dr. Chough's impressions remained the same, however - hypertensive cardiomyopathy, congestive heart failure, moderate aortic insufficiency, mild aortic stenosis, and medical noncompliance - but Jordan's overall condition appeared "stable." His blood pressure was under control and the current medical regime was "adequate." Even so, Dr. Chough observed that Jordan was having difficulty finding

10

work, opined that he "may not be able to do any job," and recommended that "he be completely disabled." (R. 608).

Dr. Chough then referred Jordan to Dr. Ryan Seutter for an automatic implantable cardioverter defibrillator ("AICD"), intended for primary prevention. (R. 609-10). Dr. Seutter's notes reflect no change in Jordan's ejection fraction range from 2010 - 2011, which remained at 25-30%. Jordan admitted to a six-month period during that time frame in which he failed to take his prescribed medications. (R. 609). He also expressed concern about the AICD, ultimately prompting Dr. Seutter to recommend he continue on his medications as prescribed for the next six months and repeat an echocardiogram in the fall to determine whether the AICD would be needed. (R. 609).

For his part, Jordan testified during his May 2012 hearing before the ALJ that on an average day he frequently slept, not getting out of bed until 2:00 p.m. (S. R. 19, 24). When awake, Jordan testified that he spent the afternoon watching DVDs and eating, though he was usually unable to watch a complete 2-hour movie without falling asleep. Id. at 19-20. He explained that he was able to bathe himself and cook simple meals, but did no housework beyond washing his own clothes. Id. at 19-20, 23. He had no hobbies, though he "would like to fish" if he were physically able. Id. at 20. He read no books, was not a member of any club or organization, but did go to church. Id. at 20-

21.   Additionally, Jordan reported a limited attention span and constant drowsiness brought on by the medications he was taking. Id. at 22-23.   Notwithstanding this, Jordan testified he occasionally drove when he had access to a vehicle, though he limited his driving due to blurred vision.  Id. at 25.

When questioned about his previous failure to take his prescribed medications, Jordan explained he had been unable to afford them initially, but had since worked something out with Dr. Chough to allow him access.   Id. at 26.   Jordan further testified that he was a "recovering addict," eighteen months sober as of the hearing date, and attended AA meetings two or three times a month.  Id. at 27.   Lastly, Jordan indicated he had quit smoking, though "[i]t's been hard," and he admittedly smoked the night prior to the hearing.  Id. at 30.   He explained that Dr. Chough "told [him he] could," and that a pack of cigarettes would last him three days.  Id. at 30-31.

Finally, the ALJ also heard from a vocational expert ("VE").  (R. 57-60).  The VE described Jordan's prior employment as a concrete finisher as heavy, skilled labor; as a steel fabrication helper as heavy, unskilled labor; as a track laying machine operator as very heavy, semi-skilled work; and as a general heavy equipment operator as medium, skilled labor.  (Id. at 33).   The ALJ asked the VE to consider Jordan's age, education and work background.  Id.   The VE was asked to assume

that Jordan can perform a full range of sedentary work, limited
to occasional postural activity, no pushing or pulling against
any weight with his extremities, no exposure to excessive dust,
smoke, chemicals, fumes, extreme temperature, or high humidity,
and restricted to simple tasks and occasional public interaction
- all in a stable work environment.  Id. at 33-34.  Under those
limitations, the VE opined Jordan would be capable of performing
sedentary, unskilled work in the national economy, specifically
in a position such as an automatic grinding machine operator and
other sedentary assembler jobs.  Id.  If an individual was off-
task 25 percent or more of a workday, would need a sit/stand
option, or would need to lay down to rest during an eight-hour
day, however, these jobs would be unavailable.  Id. at 59.

### III. STANDARD OF REVIEW

In reviewing a decision of the Commissioner denying
benefits, the Court is limited to determining whether the
decision was supported by substantial evidence on the record and
whether the proper legal standard was applied in evaluating the
evidence.  42 U.S.C. § 405(g); Johnson v. Barnhart, 434 F.3d
650, 653 (4th Cir. 2005) (per curiam); Hays v. Sullivan, 907
F.2d 1453, 1456 (4th Cir. 1990).  Substantial evidence is "such
relevant evidence as a reasonable mind might accept as adequate
to support a conclusion."  Richardson v. Perales, 402 U.S. 389,
401 (1971) (quoting Consol. Edison Co. of New York v. NLRB, 305

U.S. 197, 229 (1938)). It consists of "more than a mere scintilla" of evidence, but may be somewhat less than a preponderance. Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966).

The Court does not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996); Hays, 907 F.2d at 1456. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)." Craig, 76 F.3d at 589. The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed. Perales, 402 U.S. at 390. Thus, reversing the denial of benefits is appropriate only if either the ALJ's determination is not supported by substantial evidence on the record, or the ALJ made an error of law. Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

## IV.  ANALYSIS

To qualify for disability insurance benefits under sections 416(i) and 423 of the Social Security Act, 42 U.S.C. §§ 416(i) and 423, an individual must meet the insured status requirements of these sections, be under age sixty-five, file an application for disability insurance benefits and a period of disability,

14

and be under a "disability" as defined in the Act.

The Social Security Regulations define "disability" as the:

> Inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

20 C.F.R. § 404.1505(a); see also 42 U.S.C. §§ 423(d)(1)(A) and 416(i)(1)(A). To meet this definition, a claimant must have a "severe impairment" which makes it impossible to do previous work or any other substantial gainful activity that exists in the national economy. 20 C.F.R. § 404.1505(a); see 42 U.S.C. § 423(d)(2)(A).

The regulations promulgated by the Social Security Administration provide that all material facts will be considered in determining whether a claimant has a disability. The Commissioner follows a five-step sequential analysis to ascertain whether the claimant is disabled. The five questions which the ALJ must answer are:

1. Is the individual involved in substantial gainful activity?

2. Does the individual suffer from a severe impairment or combination of impairments which significantly limit his or her physical or mental ability to do the work activities?

3. Does the individual suffer from an impairment or impairments which meet or equal those listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1 (a "listed impairment"

or "Appendix 1")?

4. Does the individual's impairment or impairments prevent him or her from performing his or her past relevant work?

5. Does the individual's impairment or impairments prevent him or her from doing any other work?

An affirmative answer to question one, or a negative answer to question two or four, results in a determination of no disability. An affirmative answer to question three or five establishes disability. This analysis is set forth in 20 C.F.R. §§ 404.1520 and 416.920. The burden of proof and production rests on the claimant during the first four steps, but shifts to the Commissioner on the fifth step. Pass v. Chater, 65 F.3d 1200, 1203 (4th Cir. 1995) (citing Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992)).

When conducting this five-step analysis, the ALJ must consider: (1) the objective medical facts; (2) the diagnoses, and expert medical opinions of the treating and examining physicians; (3) the subjective evidence of pain and disability; and (4) the claimant's educational background, work history, and present age. Hayes v. Gardner, 376 F.2d 517, 520 (4th Cir. 1967) (citing Underwood v. Ribicoff, 298 F.2d 850, 851 (4th Cir. 1962)). At all steps the ALJ bears the ultimate responsibility for weighing the evidence. Hays, 907 F.2d at 1456.

A.   The ALJ's Decision

In this case, after first finding that Jordan met the

insured status requirements of the Social Security Act through September 30, 2012, the ALJ made the following findings under the five part analysis: (1) Jordan has not engaged in substantial gainful activity since his alleged onset date of May 20, 2009; (2) he had severe impairments of degenerative disc disease of the lumbar spine, aortic insufficiency, congestive heart failure, hypertension, obesity, and drug and alcohol abuse; (3) he did not have an impairment or combination of impairments that met or equaled the severity of one of the listed impairments in Appendix 1; (4) Jordan was unable to perform his past relevant work, but did have the RFC to perform sedentary work with added limitations[5]; and (5) considering Jordan's age, education, work experience, and residual functional capacity, jobs exist in significant numbers in the national economy that Jordan can perform. (R. 19-25).

Jordan now argues the ALJ erred in determining his RFC. Specifically, he claims the ALJ improperly evaluated the medical evidence submitted by his treating cardiologist, Dr. Chough, in reaching his conclusion that Jordan retained the ability to perform a limited range of sedentary work. The Court considers his argument below.

---

[5] Jordan could lift and carry up to 10 pounds frequently and occasionally, "only occasionally climb, balance, stoop, kneel, crouch and crawl, but not push and pull against resistance with either his upper or lower extremities, and not work in areas with exposure to excessive dust, smoke, chemicals, fumes, temperature extremes or high humidity." Jordan also needed a stable work environment with limited public interaction. (R. 21).

**B.**   **The ALJ properly evaluated the evidence bearing on Jordan's RFC.**

Jordan contends the ALJ erred in determining his RFC, which is defined as the plaintiff's maximum ability to work despite his impairments.   20 C.F.R. § 404.1545(a)(1); see SSR 96-9p, 1996 WL 374185 (S.S.A.) ("RFC is the individual's maximum remaining ability to perform sustained work on a regular and continuing basis.").   When a plaintiff's impairments do not meet or equal a listed impairment under step three of the sequential analysis, the ALJ must then determine the plaintiff's RFC.   20 C.F.R. § 404.1520(e).   After doing so, the ALJ uses that RFC at step four of the sequential analysis to determine whether the plaintiff can perform his past relevant work.   Id. at § 404.1545(a)(5)(i).   If it is determined that the plaintiff cannot perform past relevant work, the ALJ uses the RFC at step five to determine if the plaintiff can make an adjustment to any other work that exists in the national economy.   Id. at 404.1545(a)(5)(ii).

At the administrative hearing level, the ALJ alone has the responsibility of determining RFC.   Id. at § 1546(c).   RFC is determined by considering all the relevant medical and other

18

evidence[6] in the record. _Id._ at §§ 404.1545(a)(3) and 404.1527(b). Relevant evidence includes "information about the individual's symptoms and any 'medical source statements' – i.e., opinions about what the individual can still do despite his or her impairment(s) – submitted by an individual's treating source or other acceptable medical sources." SSR 96-8p, 1996 WL 374184, at *2 (S.S.A.). In this case, the ALJ found that Jordan has the RFC to perform sedentary work with specified limitations. (R. 21).

> i. The ALJ properly evaluated Dr. Chough's opinion evidence.

Jordan's sole contention in this case is that the ALJ erred by improperly considering and evaluating the evidence submitted by one of his treating physicians, Dr. Chough. Specifically, Dr. Chough, a cardiologist, "opined on 2 occasions that [Jordan] was unable to work." (ECF No. 14 at 2). According to Jordan, Dr. Chough's treatment records "prove" that he "was disabled on or before September 30, 2012 due to congestive heart failure." _Id._ at 3. The ALJ's failure to give Dr. Chough's opinion any weight, he claims, was improper error. (ECF No. 11 at 8).

As stated previously, the ALJ alone has the responsibility of determining RFC. In doing so, the ALJ must consider the

---

[6] "Other evidence" includes statements or reports from the claimant, the claimant's treating or nontreating source, and others about the claimant's medical history, diagnosis, prescribed treatment, daily activities, efforts to work, and any other evidence showing how impairments or symptoms affect the claimant's ability to work. 20 C.F.R. § 404.1529(a).

objective medical evidence in the record, including the medical opinions of the treating physicians and the non-examining medical consultants. In assigning weight to any medical opinion, the ALJ must consider the following factors: (1) "[l]ength of treatment relationship;" (2) "[n]ature and extent of treatment relationship;" (3) degree of "supporting explanations for their opinions;" (4) consistency with the record; and (5) the specialization of the physician. 20 C.F.R. § 404.1527.

Generally, the opinion of a treating physician is given more weight than that of a non-treating or non-examining medical source. Id. at § 404.1527(d)(1)-(2). A treating physician's opinion merits "controlling weight" if the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." Id. at § 404.1527(d)(2). Conversely, "if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." Craig, 76 F.3d at 590.

Because the regulations require the ALJ to evaluate every medical opinion, if the ALJ determines that a treating physician's opinion is not entitled to controlling weight, it is "still entitled to deference and must be weighed using all of

20

the factors provided in [the regulations]." SSR 96-2P, 1996 WL 374188, at *5 (S.S.A.). When the ALJ determines that the treating physician's opinion should not be given controlling weight, the ALJ must articulate "good reasons" for his decision. 20 C.F.R. § 404.1527(d)(2).[7]

Here, the ALJ determined that Dr. Chough's statements could be given "no weight." (R. 23). In support, the ALJ noted that Dr. Chough's first medical source statement provided no functional limitation assessment, instead "simply [finding] the claimant could not return to his construction work performing heavy exertional duties." Id. That assessment, the ALJ observed, was based on a "one-time visit" that included findings of medical noncompliance, as well as a note that Jordan "was difficult to treat" because of that noncompliance. By not providing functional limitations in stating that Jordan could not return to his construction job, the ALJ construed Dr. Chough's opinion to suggest Jordan could not return to his past relevant work – a point on which the ALJ concurred. Id.

Regarding Dr. Chough's second statement from March 2012, the ALJ noted that he again neglected to evaluate Jordan's physical limitations, "merely stat[ing], 'he may not be able to do any job . . . .'" Id. This, the ALJ went on to explain, "was

---

[7] In fact, under the applicable regulations, the ALJ is required to "explain" in his decision the weight accorded to all opinions – treating sources, nontreating sources, state agency consultants, and other nonexamining sources. 20 C.F.R. § 404.1527(f)(2)(ii).

not a firm opinion" and warranted no weight as "it [gave] a 'half-hearted' opinion that is the ultimate issue of disability, which is always reserved for the Commissioner." Id. Moreover, the ALJ observed that Dr. Chough's opinion did not specify Jordan's limitations and was inconsistent with the progress notes his opinion was based upon. Those notes revealed further medical noncompliance, controlled blood pressure, and "just shortness of breath and fatigue." Id.

After reviewing the complete record and the ALJ's analysis, the undersigned finds no error in the weight assigned to Dr. Chough's statements. To begin with, and contrary to Jordan's assertion, the ALJ carefully considered Dr. Chough's statements in light of the record in reaching his conclusion. But he concurred with Dr. Christopher Newell's consultative opinion, whose determination that Jordan could perform sedentary work supported the ALJ's own RFC assessment. (R. 19). The ALJ also considered all of Jordan's medical records, including those from Dr. Chough, and determined Jordan's medically determinable impairments "could reasonably be expected to cause the alleged symptoms," but Jordan's statements "concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent" with the assessed RFC. (R. 22).

The ALJ specifically noted that while Jordan's records

confirmed his impairments, they also documented a "chronic history of neglect regarding compliance with treatment and medication." (R. 22). He repeatedly ignored medical instruction, opting to avoid taking his medication as prescribed. (See e.g., R. 332, 362, 371, 402, 403, 448-49, 459, 474, 597-99, 609). Indeed, while Jordan testified at the Hearing that he was 18 months sober, his medical records clearly document instances of drug and alcohol abuse within that time frame. (See R. 473-74, 448-49). He repeatedly smoked cigarettes despite explicit direction not to, (see e.g., R. 388), and while he claimed at the Hearing that Dr. Chough gave him permission to smoke, nothing has been provided to suggest that that was true. To the contrary, Dr. Chough's notes indicate that Jordan specifically denied any tobacco or alcohol use whatsoever. (R. 402).

After visiting with Dr. Newell in July 2010, Jordan's condition appears to have remained relatively the same. (See generally R. 362-64, 370-85, 403, 459, 473-86, 606-08). In addition to Jordan's physical impairments with his back and neck, Dr. Newell diagnosed congestive heart failure with a 3/6 systolic murmur, probable angina and hypertension. (R. 360). Notwithstanding this, he opined Jordan had no visual or communicative limitations, could ambulate without assistance and was still capable of standing and walking for at least two hours

during an eight-hour workday, sitting for approximately six hours, and frequently lifting and carrying up to ten pounds. Id. He should not, however, reach overhead, bend, stoop, or squat. Id.

Jordan asserts that Dr. Newell's opinion, notwithstanding the fact that "no evidence [suggested] that [he] was a cardiologist," consisted of a general physical, and as such, could not "fully examine the cardiovascular problems [Jordan] was dealing with." (ECF No. 14 at 2). In reaching his determination, however, Dr. Newell was aware of Jordan's cardiovascular background, (R. 356), and clearly took that into account when providing his functional assessment as documented by his diagnoses, which included congestive heart failure, probable angina, and hypertension. (R. 360). In contrast, Dr. Chough made conclusory statements regarding disability without ever recording any observations of a physical functional assessment.

During his treatment of Jordan, Dr. Chough specifically referenced the challenges associated with his history of medical noncompliance. (R. 403). He initially diagnosed Jordan in 2009 with hypertensive cardiomyopathy, congestive heart failure, moderate aortic insufficiency, mild aortic stenosis, and medical noncompliance. Id. However, during his second appointment with Jordan, occurring in 2012, Dr. Chough noted mainly dyspnea on

exertion and easy fatigue, though his overall impressions remained unchanged. (R. 606-08). His overall condition was stable, his blood pressure was under control, and his medical regime was "adequate." Despite the depth of his treatment, however, neither of Dr. Chough's medical statements attempted to assess Jordan's physical abilities. Further, Dr. Chough's opinions regarding Jordan's employability first related to Jordan's inability to continue his past relevant work in 2010 – a point with which the ALJ agreed – and then, in 2012, was tempered by a hesitant "*may* not be able to do any job."

When evaluating opinion evidence, all of the medical findings and other evidence that support a medical source's statement of disability are considered. Importantly, "[a] statement by a medical source that [a claimant is] 'disabled' or 'unable to work' does not mean" the claimant will be determined disabled. 20 C.F.R. § 404.1527(d)(1). Such statements relate to a finding reserved for the Commissioner and are never entitled to controlling weight. See 20 C.F.R. § 404.1527(e)(1) and (e)(2); see also Ricks v. Comm'r of Soc. Sec., No. 2:09CV622, 2010 WL 6621693, at *9 (E.D. Va. Dec. 29, 2010). Here, the ALJ considered Dr. Chough's evidence in light of the record and opted to give greater weight to the State agency consultant's findings than to his statements. Dr. Chough's treatment, though extensive, provided little justification for his conclusion,

albeit noncommittal, that Jordan was unable to work. Thus, for the reasons outlined above, Jordan's complaint that the ALJ improperly gave Dr. Chough's opinion no weight is not correct and the ALJ's decision is supported by substantial evidence.

## V.   RECOMMENDATION

For the foregoing reasons, the undersigned recommends that the Court GRANT the Commissioner's motion for summary judgment (ECF No. 12), DENY Jordan's motion for summary judgment (ECF No. 10), and affirm the final decision of the Commissioner.

## VI.   REVIEW PROCEDURE

By copy of this Report and Recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1.   Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date of mailing of this Report to the objecting party, 28 U.S.C. § 636(b)(1)(C), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure.   A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.

2.   A district judge shall make a _de novo_ determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file

timely objections to the findings and recommendations set forth above will result in waiver of right to appeal from a judgment of this Court based on such findings and recommendations. Thomas v. Arn, 474 U.S. 140 (1985); Carr v. Hutto, 737 F.2d 433 (4th Cir. 1984); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

                                        /s/
                              Douglas E. Miller
                              United States Magistrate Judge

                              _____

                              DOUGLAS E. MILLER
                              UNITED STATES MAGISTRATE JUDGE

June 18, 2014